**NOT FOR PUBLICATION**                                    **CLOSED**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| RICHARD SCOTT, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | CIVIL ACTION NO. 06-121 (JAP) |
| | : | |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | **OPINION** |
| Defendant. | : | |
| | : | |

_____

APPEARANCES:

AGNES S. WLADYKA, Esq.
Abromson & Carey
60 Park Place Suite 601
Newark, New Jersey 07102
     Attorney for Plaintiff


Christopher J. Christie, Esq.
United States Attorney
Tomasina DiGrigoli, Esq.
Special Assistant United States Attorney
Office of the United States Attorney
Social Security Administration
26 Federal Plaza
Room 3904
New York, NY 10278
     Attorneys for Defendant

PISANO, District Judge:

Before the Court is Richard Scott's ("Plaintiff") appeal from the Commissioner of the Social Security Administration's ("Commissioner") final decision denying his request for Disability Insurance Benefits ("DIB"). The Court has jurisdiction to review this matter under 42 U.S.C. § § 405(g) and decides this matter without oral argument, *see* Fed R. Civ. P. 78. The record provides substantial evidence supporting the ALJ's decision that Plaintiff was able to engage in substantial gainful activity and therefore was not disabled. Accordingly, the Court affirms.

## I.      Background

Plaintiff was born on April 24, 1952. He has more than a high school education. His past relevant work history is as a business consultant, information systems manager, senior systems analyst and systems analyst. Plaintiff asserts that he became disabled on August 31, 2002, due to severe compression on the cervical cord, high grade disc degeneration (cervical spine), severe stenosis from C3-C4 to the C6-C7 level, severe compression foraminal nerve roots, posterior and anterior spurs (cervical spine), osteoarthritis (cervical spine), posterior herniated discs (cervical spine), sever osteoarthritis (left knee), and osteoarthritis (right knee).

## A.      Procedural History

Plaintiff filed an application for benefits on October 29, 2003, alleging an inability to work since August 31, 2002 due to a severe and disabling medically determinable impairment. The Social Security Administration ("SSA") denied Plaintiff's claim initially and upon reconsideration. On March 24, 2005, a hearing was held before Administrative Law Judge Suanne Strauss ("ALJ"). On April 22, 2005, the ALJ issued a written decision denying

2

Plaintiff's claim.  Plaintiff then filed an appeal of the ALJ's decision with the Social Security

Appeals Council ("Appeals Council") on May 31, 2005.  The Appeals Council denied this

request on August 4, 2005, making the ALJ's decision the Commissioner's final decision on the

issue of Plaintiff's request for benefits.

**B.**      **Factual History**

      **1.**      **Plaintiff's Previous Employment**

According to Plaintiff, his only past relevant work history was as a manager of

information systems.  During a normal work day, Plaintiff contends he would spend five or six

hours sitting at his desk, while spending two hours performing other job related activities that

involved walking and moving equipment.

On August, 31, 2002, Plaintiff's position was eliminated by "company downsizing,"

forcing Plaintiff to leave his job.  (R. 376).  However, Plaintiff speculates that he was laid off

because his physical condition left him unable to perform some of his duties, forcing his

subordinates to complete many of them.  Additionally, Plaintiff speculates that his many

medically related absences from work contributed to his dismissal.  However, Plaintiff testified

that had his job not be eliminated, he would have attempted to continue working.  (R. 376).

Plaintiff testified that he used an over the door appliance containing sixteen pounds of

water, twice a day for twenty minutes at work.  (R. 383).  The appliance pulled up the sixteen

pounds of weight on Plaintiff's jaw, lifting his head straight up.  It was designed to alleviate

pressure and to reduce the numbness and tingling that was going down his arm, caused by

compressed and herniated discs.   Plaintiff contends that the unit prohibited communication with

co-workers during the use of the unit because of the weight placed on his jaw.  (R. 383).

Additionally, his employer provided him with a special orthopaedic chair for his back, along with a wireless keyboard and mouse, in an attempt to make Plaintiff more comfortable.  Plaintiff contends that neither the chair nor wireless keyboard and mouse relieved his pain.  (R. 384).

Also, Plaintiff testified that his condition left him unable to concentrate, impeding his ability to work.  (R. 389).  He contends that the medication he took caused him to feel woozy, inhibiting his ability to concentrate, blurring his vision and causing headaches while reading.

### 2.    Plaintiff's Daily Activities

At Plaintiff's hearing before the ALJ, he testified that he is unable to participate in any active outdoor activity.  (R. 385-86).  He stated that he spends six hours a day on a recliner, three to four of them watching television.  He testified that he attempts to read but has trouble because of his blurry vision and headaches.  (R. 387).  Additionally, Plaintiff stated that he does not perform any chores around the house and spends eight to nine hours a day in bed.

Plaintiff testified that in the morning, he receives a treatment from a muscle stimulator and then drives to the YMCA, spending three hours alternating between swimming and sitting in a hot tub.  However, Plaintiff testified that he is unable to perform any weight or cardiovascular training as a result of his arthritis.  Upon arrival home, Plaintiff stated that he receives another treatment from his muscle stimulator before sitting in his recliner for the remainder of the night.  Prior to going to bed, Plaintiff stated that he takes one more muscle stimulator treatment, resulting in a total of three treatments for one hour each.  (R. 381).

### 3.    Plaintiff's Medical History

The record indicates that Plaintiff has received medical consultation and care for various ailments of the knee, neck and back.  On March 20, 2001, Plaintiff saw Mark Durback, M.D.

4

During this visit, Plaintiff stated that his prescription of Celebrex and an injection of Depo-Medrol that was given on February 13, 2001 had helped to ease pain in his knee.  Plaintiff was diagnosed with osteoarthritis of the left knee, but denied pain "in the thighs, hips, lower back, upper back, shoulders or neck."  (R. 322).

From this point forward, Plaintiff saw Dr. Durback over 15 times for various consultations and treatments, concluding on August 17, 2004.  Over the course of these visits, Dr. Durback diagnosed Plaintiff with osteoarthritis of the left knee, thoracic and cervical spine osteoarthritis, stenosis of the cervical spine and degenerative disc disease with right arm radiculopathy.  (R. 289, 316-17).

During an examination on November 13, 2001, Plaintiff was found to be in no acute distress.  Additionally, he had normal strength in both his arms and legs and had no neurological deficits.  (R. 317).  The same remained true for all examinations between this time and July 14, 2004, at which time Dr. Durback concluded that Plaintiff "has chronic discomfort in his neck and upper back, but not severe now on Vioxx."  (R. 287).  In an examination on March 9, 2004, Dr. Durback reported that Plaintiff "drinks beer - about 2 every other day."  (R. 301).

On October 13, 2004, Dr. Durback submitted radiological reports demonstrating five radiological views of the lumbar spine, showing advanced degenerative facet arthritis at L5-S1. Additionally, a radiological view of Plaintiff's pelvis demonstrated a narrowing of both hip joints with mild subchondral sclerosis and osteophytosis of the acetabular roofs.  (R. 339-40).

On May 19, 2004, Dr. Durback completed two residual functional capacity assessments. (R. 290-300).  These assessments indicate that Plaintiff's pain is often severe enough to hinder his ability to pay attention and concentrate.  Additionally, Dr. Durback concluded that Plaintiff

can stand and walk less than two hours during an eight-hour work day, should not sit longer than 45 minutes continuously or two hours total and would be absent from work more than four days per month.  Dr. Durback also advised that the Plaintiff should never twist, stoop, crouch, or climb ladders or stairs.  This led Dr. Durback to believe that the Plaintiff can tolerate no more than "moderate stress" employment.  (R. 296).  During this period of time, Plaintiff continued to consult his general physician.  On April 5, 2004, the general physician described Plaintiff as a "healthy appearing individual in no distress" and was of "normal activity and energy level."  (R. 219).

Plaintiff went on another consultative evaluation conducted by Dr. Adam Zimmerman, D.O., on January 1, 2004.  Here, Plaintiff denied the use of alcohol.  Although Dr. Zimmerman found Plaintiff to have significant neck pain, he found Plaintiff to have "full unrestricted use of his upper extremities, for gross and fine manipulation."  (R. 209).  Additionally, Dr. Zimmerman concluded that Plaintiff's "passive range of motion of the hips and ankles are full and unrestricted" and his "cervical spine and lumbar spine passive range of motion are full and unrestricted."  (R. 209).  Dr. Zimmerman based his conclusions on the fact that Plaintiff was able to fully extend his hands, oppose his fingers and make fists with both hands, as well as separate papers and fasten buttons.  Additionally, his grip strength and pinch strength were 5/5 bilaterally and there was negative straight leg raising in the supine position bilaterally.  (R. 209).

Dr. Zimmerman also noted that Plaintiff was unable to walk on his heels, could not squat or walk at a reasonable pace and used a self prescribed crutch.  Dr. Zimmerman concluded by stating that "he may be able to perform some sort of sedentary work, although there may be some difficulty with extended periods of time."  (R. 210).

On March 25, 2004, Plaintiff underwent a physical residual functional capacity assessment with R. Briski, M.D.  After reviewing Plaintiff's records, Dr. Briski concluded that Plaintiff could sit for about six hours in an eight-hour workday, while standing or walking between two and four hours during this same time period.  Dr. Briski stated further that Plaintiff could lift and carry 10 pounds frequently, but only 20 pounds occasionally and should only occasionally climb, kneel, crouch or crawl.  (R. 212).

Due to a referral by Dr. Durback, Plaintiff saw Dr. Sun on September 7, 2004 for a pain management evaluation.  (R. 344-349).  At this consultation, Plaintiff complained of pain during the last month that rated at worst, an eight on a ten point scale, and at best, a four.  (R. 345).  He also stated that this pain prohibited him from many daily functions, including walking stairs, and severely limited his effectiveness at work.  (R. 346).  Despite these complaints, Dr. Sun concluded that Plaintiff was in no acute distress and "was able to demonstrate full range of motion."  (R. 348).  Additionally, Plaintiff "could forward flex to 45 degrees, extend 15+ degrees, and rotate 70-80 degrees without any significant discomfort."  (R. 348)

At this consultation, Plaintiff stated that the ability of Endocet and Cyclobenzaprine to decrease his pain was a four on a scale of ten, Vioxx as a two and Hydrocodone as three.  However, Plaintiff reported that he took these medications only intermittently, causing Dr. Sun to remark: "I am not clear as to why he requested a more potent narcotic analgesic when he only intermittently take the medication.  He was not able to explain this."  (R. 349).  At this consultation, Dr. Sun prescribed avinza, a once-daily morphine prescription.  (R. 349).

At a subsequent visit with Dr. Sun on October 26, 2004, Plaintiff had good range of motion in all planes.  (R. 341).  Dr. Sun did diagnose Plaintiff with cervalgia, myofascial pain

syndrome, chronic back pain, degenerative disc disease of cervical spine, herniated nucleus pulposus of cervical spine, and intermittent radiculopathy.  (R. 341).

Over the course of this period of time, Plaintiff underwent various MRIs, X-rays and EMGs.  On September 7, 2001, an MRI at Open MRI of Phillipsburg showed severe stenosis of the cervical spinal canal with marked compression upon the cervical cord.  Additionally, bilateral neural foraminal stenosis was present with nerve root compression.  (R. 122).  The MRI demonstrated severe compression upon the cervical cord and right and left neural foraminal nerve root compression along with several herniated discs.  (R. 123).

On September 28, 2001, an MRI analyzed by Casey K. Lee, M.D., showed a bulging disc with congenital mild narrowing of the spinal canals between C3 and C7 and a bulging disc at C6-7 resulting in a diagnosis of cervical radiculopathy at C7 on the right side.  (R. 138).  On October 6, 2001, another MRI was conducted on Plaintiff demonstrating spurs or hard discis present at multiple levels extending from the C2-C3 level through and including the C7-T1 level, predominantly central but lateralized to the left at the C3-4 and C7-T1 levels and neuro-foraminal narrowing at the C5-C6 level.  (R. 205).  Another MRI on Plaintiff's cervical spine, taken on February 23, 2002, showed degenerative disc disease in the lower cervical spine with spinal canal and foraminal stenosis at C5-6 and C6-7 and a small annular disc bulge at C3-4.  (R. 203)

On October 12, 2001, an EMG by Dr. Lee displayed radiculopathy on the right side at C5, 6, and 7 and the left side at C8.  (R. 137).  On March 4, 2002, Dr. Lee analyzed an X-ray that demonstrated severe narrowing of the C4-5, C5-6 and C6-7 disc space with foraminal osteophytes. (R. 132).  However, Dr. Lee informed Plaintiff that although he was a candidate for

surgery, the only way the surgery would be successful would have been to fuse Plaintiff's entire neck, which was not an option.  (R. 388-89).

In an examination conducted by Dr. Lee on February 19, 2002, Plaintiff showed a painful limitation of the cervical spine.  (R. 133).  On March 4, 2002, Dr. Lee noted that Plaintiff's pain had been persistent with a level of six on a scale of zero to ten.  (R. 132).  This pain, however, showed improvement, as Dr. Lee stated the pain was reduced to three or four on March 15, 2002.  (R. 131).  Additionally, at this examination, as well as an examination conducted on April 12, 2002, Dr. Lee noted that Plaintiff had made significant improvement as a result of the physical therapy he had been receiving.  (R. 130).

In a visit with Dr. Paul J. Roberts on January 26, 2001, a study on Plaintiff demonstrated mild right side carpal tunnel syndrome.  (R. 121).  Additionally, on October 9, 2001, Dr. Barbara Kennan reported that an EMG finding in the left APB may be suggestive of carpal tunnel syndrome bilaterally.  (R. 127).

### 4.        Testimony of Vocational Expert

_____Lee Levin, the vocational expert, testified that Plaintiff's skills are transferable to less intellectually demanding, semi-skilled jobs such as data entry.  (R. 398).  Ms. Levin found that a data entry job requires six hours of sitting and that the main function is keyboarding.  (R. 399).  Additionally, Ms. Levine testified that a data entry job does not usually require any lifting.  (R 399).

Ms. Levin opined that if Plaintiff's testimony was found to be credible, Plaintiff would not be able to perform a data entry job, as Plaintiff claimed he was only able to sit for a maximum of two hours.  (R. 398, 400).  Ms. Levine also testified that a person performing a data

entry position would have permission to take unscheduled breaks, provided that all of the work could still be completed on time.  (R. 400).  Finally, Ms. Levine testified that Plaintiff would not be able to work if his pain interfered with his concentration nor if his usage capability of his hands was limited between five to twenty percent.  (R. 401-02).

## II.    <u>Standard of Review</u>

A reviewing court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." 42 U.S.C. § 405(g); § 1383(c)(3) ("The final determination of the Commissioner of Social Security. . . shall be subject to judicial review as provided in section 405(g) . . ."); *Williams v.  Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992).  "Substantial evidence" means more than "a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*.  The inquiry is not whether the reviewing court would have made the same determination, but rather whether the Commissioner's conclusion was reasonable.  *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir.  1988).  Thus, substantial evidence may be slightly less than a preponderance.  *Stunkard v. Sec'y of Health & Human Servs.*, 841 F.2d 57, 59 (3d Cir. 1988).

Some types of evidence will not be "substantial."  For example,

'[a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence - particularly certain types of evidence (e.g. that offered by treating physicians) - or if it really constitutes not evidence but mere conclusion.'

*Wallace v.  Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting *Kent*

*v.  Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).

The reviewing court must review the evidence in its totality.  *See Daring v. Heckler*, 727

F.2d 64, 70 (3d Cir. 1984).  In order to do so, "a court must 'take into account whatever in the

record fairly detracts from its weight.'" *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J.

1997) (quoting *Willibanks v. Sec'y of Health & Human Servs.*, 847 F.2d 301, 303 (6th Cir.1988)

(internal citation omitted)).  The Commissioner has a corresponding duty to facilitate the court's

review:  "[w]here the [Commissioner] is faced with conflicting evidence, he must adequately

explain in the record his reasons for rejecting or discrediting competent evidence." *Ogden v.*

*Bowen*, 677 F. Supp. 273, 278 (M.D. Pa.  1987) (citing *Brewster v. Heckler*, 786 F.2d 581 (3d

Cir. 1986)).  As the Third Circuit has held, access to the Commissioner's reasoning is indeed

essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently
> explained the weight he has given to obviously probative exhibits, to say that
> his decision is supported by substantial evidence approaches an abdication of
> the court's duty to scrutinize the record as a whole to determine whether the
> conclusions reached are rational.

*Gober v.  Matthews*, 574 F.2d 772, 776 (3d Cir. 1978) (quoting *Arnold v. Sec'y of Health, Educ.*

*& Welfare*, 567 F.2d 258 (4th Cir. 1977).  Nevertheless, the district court is not "empowered to

weigh the evidence or substitute its conclusions for those of the fact-finder."  *Williams*, 970 F.2d

at 1182.

## A.      The Record Must Provide Objective Medical Evidence

Under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq.* and 42 U.S.C.

§ 1381 *et seq.*, a claimant is required to provide objective medical evidence in order to prove his

disability.  42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a

11

disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require."); 42 U.S.C. § 1382c(H)(i) ("In making determinations with respect to disability under this subchapter, the provisions of sections. . . 42 U.S.C. § 423(d)(5)(A) of this title shall apply in the same manner as they apply to determinations of disability under subchapter II of this chapter.").

Accordingly, a Plaintiff cannot prove that he is disabled based solely on his subjective complaints of pain and other symptoms. *See Green v. Schweiker*, 749 F.2d 1066, 1069-70 (3d Cir. 1984) (emphasizing that "subjective complaints of pain, without more, do not in themselves *constitute* disability."). He must provide medical findings that show that he has a medically determinable impairment of such severity that he is unable to engage in any substantial gainful activity. *See id.; see also* 42 U.S.C. § 423(d)(1)(A) (defining a disabled person as one who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . ."); 42 U.S.C. § 1382c(a)(3)(A) (same).

Furthermore, a claimant's symptoms, "such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect . . . [one's] ability to do basic work activities unless "medical signs" or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. § 404.1529(b); *see Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) (rejecting claimant's argument that the ALJ failed to consider his subjective symptoms where the ALJ made findings that complaints of pain and symptoms were inconsistent with objective medical evidence and claimant's hearing testimony); *Williams*, 970 F.2d at 1186 (denying claimant benefits where claimant failed to proffer medical findings or signs that he was unable to work).

12

**B.**     **The Five-Step Analysis for Determining Disability**

_____Social Security Regulations provide a five-step sequential analysis for evaluating whether a disability exists.  *See* 20 C.F.R. § 20 C.F.R. §§ 404.1520, 416.920.[1]  For the first two steps, the claimant must establish (1) that he has not engaged in "substantial gainful activity" since the onset of his alleged disability, and (2) that he suffers from a "severe impairment" or "combination of impairments."  20 C.F.R. §§ 404.1520(a)-(c), 416.920(a)-(c).  Given that a claimant bears the burden of establishing these first two requirements, the failure to meet this burden automatically results in a denial of benefits.  *See Bowen v.  Yuckert*, 482 U.S. 137, 146-47 n.5 (1987).

If the claimant satisfies his initial burdens, the third step requires that he provide evidence that his impairment is equal to or exceeds one of those impairments listed in Appendix  1 of the Code of Federal Regulations ("Listing of Impairments").  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  Upon such a showing, he is presumed to be disabled and is automatically entitled to disability benefits.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If he cannot so demonstrate, the benefit eligibility analysis proceeds to steps four and five.

The fourth step of the analysis focuses on whether the claimant's "residual functional capacity" sufficiently permits him to resume his previous employment.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).  "Residual functional capacity" is defined as "that which an individual is still able to do despite limitations caused by his or her impairments."  20 C.F.R. §§

---

[1]  The regulations implementing the standard for obtaining disability insurance benefits, 42 U.S.C. § 401 *et seq.*, and those implementing the standard for supplemental security income, 42 U.S.C. § 1381 *et seq.* are the same in all relevant respects.  *See Sullivan  v. Zebley*, 493 U.S. 521, 526 n.3 (1990).

404.1520(e), 416.920(e).  If the claimant is found to be capable of returning to his previous line of work, then he is not "disabled" and not entitled to disability benefits.  20 C.F.R. §§ 404.1520(e), 416.920(e).  Should the claimant be unable to return to his previous work, the analysis proceeds to step five.

At step five, the burden shifts to the Commissioner to demonstrate that the claimant can perform other substantial gainful work in the national economy, considering his residual functional capacity, age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).  The Dictionary of Occupational Titles classifies the different levels of physical exertion, namely, sedentary, light, medium, heavy, and very heavy, that could be associated with a job.  *See* 20 C.F.R. §§ 404.1567, 416.967.  If the Commissioner cannot satisfy the burden, the claimant shall receive social security benefits.  *Yuckert,* 482 U.S. at 146-47 n.5.

### III.    The ALJ's Decision

After reviewing the available evidence and considering Plaintiff's testimony, the ALJ concluded that Plaintiff was not disabled.  The ALJ made the following findings:

### A.    Steps One and Two

The ALJ first determined that the Plaintiff had not engaged in any substantial gainful activity since August 31, 2002, the onset of his disability.  Next, the ALJ had to determine whether any of Plaintiff's ailments were "severe."  The ALJ found that Plaintiff's thoracic and cervical spine osteoarthritis and degenerative disc disease, cervical spinal stenosis, right arm radiculopathy, osteoarthritis and knee pain, and obesity were all severe impairments within the meaning of the regulations.

14

**B.**    **Step Three**

The ALJ proceeded to step three of the analysis, where it is determined whether the claimant's impairments meet or equal any of the impairments documented in the Listing of Impairments.  First, the ALJ found that the Plaintiff's impairments did not equal any of the listings.  In so finding, the ALJ stated that there was "no statement in the record from a physician indicating that the claimant's impairments are equivalent to a listed impairment."  (R. 20)

Next, the ALJ focused on whether the Plaintiff had an impairment that met the criteria of any listed impairment.  In this analysis, the ALJ focused on two listings, 1.02 (major dysfunction of a joint) and 1.04 (disorders of the spine).  The ALJ found that 1.02 was not met because Plaintiff was able to ambulate effectively and could perform fine and gross movements in both upper extremities.  In making this determination, the ALJ cited to the fact that Plaintiff was not housebound because he traveled to the YMCA each day and does not use any assistive devices to walk.  Additionally, the ALJ stated that the Plaintiff had grip strength of 5/5 in both hands, could walk on his toes, had no sensory or reflex loss bilaterally, and had full and unrestricted use of his upper extremities for gross and fine manipulation.

The ALJ also determined that the criteria of 1.04A was not met.  Listing 1.04A is met when the spinal cord or a nerve root is compromised, with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex, and (if there is involvement of the lower back), positive straight-leg raising test. 20 C.R.F., Part 404, Appendix 1, Subpart P.  In her findings, the ALJ cited to consultative evaluations that determined the Plaintiff had full and unrestricted passive range of motion of the hips, ankles, cervical spine and lumbar spine.  The ALJ also cited to the

fact that "there are no significant paresthesias associated with the cord compression." (R. 209).
Even when considering Plaintiff's obesity, the ALJ did not find that his impairments met or
equaled any of the listed impairments.

**C.    Step Four**

The ALJ proceeded to step four of the analysis, which focuses on whether the claimant's
residual functional capacity sufficiently permits him to resume his previous employment. As
indicated above, if the claimant is found to be capable of returning to his previous type of work,
then he is not "disabled" and therefore not entitled to disability benefits. A comparison between
the claimant's residual functional capacity and the requirements of his past relevant work is
necessary to satisfy step four. *See* 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f); *Burnett v.
Comm'r of Social Security Administration*, 220 F.3d 112, 120 (3d Cir. 2000).

The ALJ determined that based on the evidence contained in the record, Plaintiff retained
the residual functional capacity to perform work at the sedentary level. In making this
determination, the ALJ noted that Plaintiff's testimony in regard to his extreme pain and
limitation was not credible. The ALJ opined that Plaintiff swims, drives, watches television and
performs activities of daily living.

The ALJ also questioned Plaintiff's credibility regarding his use of alcohol and pain
medication. Plaintiff told one doctor that he did not drink, while telling another doctor that he
did. Additionally, one doctor questioned his use of narcotic pain medication when Plaintiff was
less than candid about his use of such narcotics.

The ALJ also found a credibility issue in regard to Plaintiff's dismissal from his job.
Plaintiff testified that he discontinued working because his position had been terminated and not

because of any physical illness.  Plaintiff claims that his disability began on August 31, 2002.

The ALJ found that this date simply corresponded to the time he was let go from his position and

did not correspond to any medically related development.

The ALJ also analyzed the medical evidence in making this determination.  Most notably,

she used the evaluations of Dr. Zimmerman and Dr. Briski in concluding that Plaintiff could

work at a sedentary level.  The ALJ dismissed the residual functional capacity assessments of Dr.

Durback because she found them incompatible with Dr. Durbacks treatment notes and Plaintiff's

treatment record as a whole.

The ALJ found that Plaintiff does not have the extreme level of pain or disability that he

claims.  However, the ALJ found that the level of pain that Plaintif did have, in combination with

medication side effects that interfere with his concentration and compliance with complex

instructions, made the Plaintiff unable to return to his previous work.

**D.**     **Step Five**

After taking into consideration Plaintiff's medically determinable impairments, age,

education, past work and functional restrictions, the ALJ determined that Plaintiff could perform

other occupations in the national economy and thus, was not disabled.  The ALJ applied Medical-

Vocational Rule 201.15 and Social Security Ruling 96-9p in making this determination.

**IV.**     **Legal Discussion**

Plaintiff asserts several arguments in favor of reversing the Commissioner's

determination.  First, Plaintiff argues that the ALJ improperly evaluated the medical evidence

and failed to give credence to Plaintiff's complaints concerning his pain, limitation of motion and

function, numbness, weakness, tingling and muscle spasms.  Second, Plaintiff argues that the

ALJ failed to evaluate the Plaintiff's impairments in combination to determine if the Plaintiff met or equaled a listed impairment in Appendix I.  Third, Plaintiff argues that the ALJ erred as a matter of law in finding that Plaintiff can perform a full range of sedentary work.  The Commissioner opposes, contending that the ALJ's decision is supported by substantial evidence and therefore should be affirmed.  The Court will address each argument in turn.

**A.**     **Whether the ALJ Properly Evaluated the Medical Evidence**

Plaintiff first argues that the ALJ improperly evaluated the medical evidence by failing to give credence to Plaintiff's various subjective complaints.  After evaluating the totality of the record, the ALJ determined that Plaintiff's testimony regarding extreme pain and limitation was not credible.  The Court finds that substantial evidence supports the ALJ's determination.

As discussed above, 20 C.F.R. § 404.1529 requires that the objective medical evidence demonstrate a basis for subjective complaints.  Complaints about pain or other symptoms alone will not establish that a claimant is disabled.  *See* 20 C.F.R. § 404.1529(a).  Rather, these complaints must be coupled with objective medical signs and laboratory findings that demonstrate a medical impairment that could reasonably produce the alleged subjective complaints.  *See id.*

In her decision, the ALJ cited to numerous doctor reports in making the determination that Plaintiff's testimony of his subjective complaints was not credible in light of the objective medical findings.  A consultation by Dr. Briski concluded in a finding that Plaintiff could sit for about six hours and stand or walk between two and four hours in an eight-hour workday.  Additionally, Dr. Briski found that Plaintiff could occasionally climb, kneel, crouch and crawl, could lift and carry 10 pounds frequently, and carry 20 pounds occasionally.

18

In an examination conducted on January 1, 2004, Dr. Zimmerman found that Plaintiff had unrestricted passive range of motion of the upper extremities, fingers, hips, ankles, cervical spine and lumbar spine.  Dr. Zimmerman did note that Plaintiff had significant neck pain, and concluded that Plaintiff may experience difficulty with extended periods of sedentary work. However, Dr. Zimmerman also stated that Plaintiff may be able to perform some sort of sedentary work.

Further, from December 19, 2000, until August 17, 2004, Plaintiff saw Dr. Durback over 15 times.  Over the course of these visits, Dr. Durback never found Plaintiff to be in acute distress and always found that Plaintiff had normal strength in his arms and legs.  Additionally, Dr. Durback noted on several occasions that different injections and physical therapy sessions were helping to alleviate Plaintiff's pain.  In a residual functional capacity assessment conducted on May 19, 2004, Dr. Durback concluded that Plaintiff should not sit longer than 45 minutes continuously or two hours total in an eight hour work day, and could only stand and walk less than two hours.  Although this assessment had a favorable outcome to the Plaintiff, the ALJ found the assessment to be incompatible with Dr. Durback's previous treatment notes, along with Dr. Zimmerman's evaluations stated above.  This amount of medical evidence provides the substantial evidence that the ALJ needed to satisfy her opinion.

Additionally, in finding that Plaintiff's complaints of pain were not as severe as Plaintiff claimed, the ALJ cited to several inconsistencies that evidenced Plaintiff's incredibility.  First, the ALJ noted that the date Plaintiff claimed he became disabled was simply the date that he lost his job.  As the ALJ expressed, there is nothing medically to suggest that this is the day that he became disabled.  In fact, Plaintiff testified that if he had not been let go from his job, he would

19

have continued to attempt to work.  The ALJ also observed that despite Plaintiff's contention that he may have been let go from his company as a result of his medical condition, in his written application and testimony, he stated that his position was eliminated as a result of "company downsizing." (R. 376).  There is no evidence in the record, other than Plaintiff's testimony itself, that directly states or even insinuates that Plaintiff was let go for any other reason than "company downsizing."

The ALJ also found credibility problems with Plaintiff's testimony regarding extreme pain and limitation.  The ALJ opined that Plaintiff swims, drives, watches television, and makes simple dinners every day.  The ALJ also cited to the fact that Plaintiff was less than candid with at least two different doctors about his use of alcohol and narcotic pain medication, diminishing his credibility even further.

Considering the relevant evidence in the record, the Court concludes that substantial evidence supports the ALJ's finding with respect to Plaintiff's subjective complaints.

**B.      Whether the ALJ Failed to Evaluate Plaintiff's Impairment in Combination to Determine if the Plaintiff Meets or Equals a Listed Impairment in Appendix I**

First, Plaintiff argues that the ALJ erred in finding that Plaintiff did not meet Listing 1.04, Disorders of the Spine.  To satisfy the criteria of a listed impairment, the condition complained of "must meet <u>all</u> of the specified medical criteria . . [a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (emphasis in original).

The relevant portion of Listing 1.04 states as follows:

**1.04 Disorders of the Spine** (e.g. herniated nucleus pulpous, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture),

20

resulting in compromise of a nerve root (including the clauda equine) or the
spinal cord. With:
A. Evidence of nerve root compression characterized by neuro- anatomical
distribution of pain, limitation of motion of the spine, motor loss (Atrophy
with associated muscle weakness or muscle weakness) accompanied by
sensory or reflex loss and, if there is involvement of the lower back, positive
straight-leg raising test (sitting and supine)

20 C.R.F., Part 404, Appendix 1, Subpart P.  In the decision, the ALJ opined that the criteria

were not met because Plaintiff's passive range of motion of his hips, ankles, cervical spine and

lumbar spine were full and unrestricted and there was no significant paresthesias associated with

the cord compression.  As noted, all of the criteria under the listing must be met.

Plaintiff notes that on February 19, 2002, an examination conducted by Dr. Lee showed a

painful limitation of the cervical spine.  Additionally, Plaintiff cites that in another examination

on March 4, 2002 by Dr. Lee, Plaintiff's pain had been persistent at a level of six on a scale of

zero to ten.  However, Plaintiff fails to mention that the pain was reduced to three or four at a

subsequent examination by Dr. Lee on March 15, 2002.  At this examination, along with one

occurring on April 12, 2002, Dr. Lee noted that Plaintiff had made significant improvement due

to physical therapy he had been going through.

As a result, it is perfectly acceptable for the ALJ to determine that Plaintiff had no

limitation of motion of the spine, as determined by Dr. Zimmerman on January 1, 2004.

Although Dr. Lee, at first, did say that Plaintiff had painful limitation of the cervical spine, the

Plaintiff failed to note that a month later, after going through physical therapy, Dr. Lee

determined that Plaintiff's condition significantly improved. (R. 130).

Plaintiff also argues that the ALJ misinterpreted the medical records when finding no

focal neurological deficits, and normal strength and sensation of the arms and legs.  However, the

record clearly shows that on multiple visits, Dr. Durback determined that Plaintiff had normal strength in both his arms and legs and had no neurological deficits.  Plaintiff simply states that his multiple orthopaedic conditions must be considered in combination, but fails to show one specific instance when a physician found a focal neurological deficit or did not find normal strength and sensation of the arms and legs.  It is not the position of the ALJ to determine that a medical condition exists when not even a doctor has done so.

Additionally, Plaintiff contends that the ALJ erred by not considering Plaintiff's bilateral carpal tunnel syndrome.  In the entire record, only two visits to physicians mention carpal tunnel syndrome.  On January 26, 2001, a electro diagnostic examination, conducted by Dr. Paul J. Roberts, demonstrated <u>mild</u> right side carpal tunnel syndrome.  An EMG conducted on October 9, 2001 by Dr. Barbara was only suggestive of bilateral carpal tunnel syndrome, therefore, not conclusive that bilateral carpal tunnel syndrome even existed.  After this visit, there is nothing in the record that Plaintiff cites to that suggests another physician diagnosed Plaintiff with bilateral carpal tunnel syndrome.  Over a three year period, consisting of countless doctor visits, it is not certain that Plaintiff had bilateral carpal tunnel syndrome.  Therefore, it was reasonable for the ALJ not to consider this condition.

Finally, Plaintiff argues that the ALJ did not discuss Plaintiff's combination of conditions, nor whether or not in combination they equal a Listed Impairment.  The regulations require that "[the ALJ] review the symptoms, signs, and laboratory findings about [a claimant's] impairments to determine whether the combination of [a claimant's] impairments is medically equal to any listed impairment."  20 C.F.R. § 404.1526(a).  The ALJ reviewed the entire record, including relevant medical records and Plaintiff's testimony, and concluded that the "medically

determinable impairments do not meet or medically equal one of the listed impairments in

Appendix 1, Subpart P, Regulation No. 4." (R. 26). Therefore, the ALJ satisfied her obligation

to review Plaintiff's impairments individually and in combination.

**C.**     **Residual Functional Capacity Determination**

The Court rejects Plaintiff's argument that substantial evidence in this case does not

support the ALJ's conclusion that Plaintiff was capable of a full range of sedentary work. On the

contrary, the ALJ's residual functional capacity assessment is supported by the medical records

of multiple physicians.[2] Although Plaintiff argues that there is no medical opinion from an

examining physician that supports the ALJ's residual functional capacity determination, reports

from both Dr. Briski and Dr. Zimmerman support the ALJ's determination. Indeed, Dr. Briski

goes as far to say that Plaintiff could sit for about six hours in an eight-hour work day while

standing or walking between two and four hours during this same time period.

Plaintiff points out that Dr. Zimmerman stated that Plaintiff may have some difficulty

performing sedentary work for extended periods of time, but fails to note that Dr. Zimmerman

did say Plaintiff may be able to perform some sort of sedentary work. Additionally, although Dr.

Durback's residual functional capacity assessment favored Plaintiff's position, the ALJ

adequately dismissed this assessment in light of Dr. Durback's own treatments notes, which

contradicted the assessment, in combination with Dr. Zimmerman's treatment notes. In light of

Dr. Zimmerman's inconclusiveness, and the adequate dismissal of Dr. Durback's assessment, it

---

[2]The Court notes that the ALJ did not find that Plaintiff could perform a <u>full</u> range of
sedentary work. Rather, the ALJ found that "the claimant has the residual functional capacity for
a <u>significant</u> range of sedentary work that does not involve frequent climbing, kneeling,
crouching, stooping or crawling." (R. 26) (emphasis added).

was well within the discretion of the ALJ to determine Plaintiff's residual functional capacity based on Dr. Briski's assessment.  *See* 20 C.F. R. § 404.1527(e)(1)-(2).

Plaintiff also contends that the vocational expert's testimony that Plaintiff could not perform data entry work if he was only able to sit for a maximum of two hours is determinative that Plaintiff cannot perform data entry work.[3]  However, Dr. Briski concluded that Plaintiff was able sit for this amount of time.  Thus, in light of both Dr. Briski's assessment and the vocational expert's testimony, the ALJ properly determined that Plaintiff could perform a significant range of sedentary work, including data entry.

Finally, Plaintiff argues that the ALJ failed to discuss the different medications that Plaintiff consumes, and their effect on his concentration and ability to work.  However, the ALJ conceded that Plaintiff could not perform skilled jobs requiring a high level of intellectual functioning and should avoid highly skilled as a result of the side effects of his medication.  Plaintiff's argument simply has no merit.

## V.    Conclusion

For the foregoing reasons, the Court concludes that substantial evidence supports the ALJ's decision denying Plaintiff's request for DIB and thus, the Commissioner's final decision is affirmed.  An appropriate order accompanies this opinion.

/s/ Joel A. Pisano
JOEL A. PISANO, U.S.D.J.

Dated: June 25, 2007

---

[3]Ms. Levin, the vocational expert, testified that Plaintiff had computer usage skills that were transferrable to less intellectually demanding semi-skilled sedentary work such as data entry.  (R. 27)